[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 03-10262 & 03-10263
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 20, 2006
THOMAS K. KAHN
CLERK

EPA Docket Nos.
2261-251-0008
4911-297-0040

THE SIERRA CLUB,

                                                                Petitioner,

versus

STEPHEN L. JOHNSON,
in his official capacity as Administrator of the
United States Environmental Protection Agency,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                                                                Respondents.

_____

Nos. 03-10264 & 03-10265
_____

EPA Docket  Nos.
2273-313-0061
2273-313-0003

GEORGIA FORESTWATCH,

                                              Petitioner,

                        versus

STEPHEN L. JOHNSON,
in his official capacity as Administrator of the
United States Environmental Protection Agency,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                                              Respondents.

_____

Petitions for Review of an Order of the
United States Environmental Protection Agency

_____

**(January 20, 2006)**

Before BIRCH, CARNES and FAY, Circuit Judges.

CARNES, Circuit Judge:

The Sierra Club and Georgia Forestwatch bring this consolidated petition

for review of the Environmental Protection Agency's orders denying their requests

that EPA object to four Clean Air Act Title V permits.  The Georgia

Environmental Protection Division issued these permits to King Finishing, Monroe Power, and Shaw Industries' Plants No. 2 and No. 80.[1]

The Sierra Club contends that EPA is required to object to the King Finishing permit because Georgia EPD failed to implement a mailing list to notify the public of its right to comment on the permit. The Sierra Club and Georgia Forestwatch also contend that EPA must object to all four of the permits because of Georgia EPD's failure to require the permittee facilities to report all of their monitoring data and to provide all relevant information to the public during the comment period.[2]

## I.

Navigating through the intricacies of the Clean Air Act is no task for the uninformed or the short-winded. We will focus our beginning discussion on Title V of that Act, because it underlies the issues before us in this appeal.

---

[1] Following changes in ownership after their title V permits were issued, King Finishing changed its name to King American Finishing, Inc., and Monroe Power changed its name to MPC Generating, LLC. The change in ownership did not affect the requirements and conditions of these facilities' permits. The record and the briefs refer to "King Finishing" and "Monroe Power," and for the sake of consistency, so do we.

[2] The petition for review and the parties' initial briefs addressed an additional issue concerning Monroe Power's monitoring of its carbon monoxide emission limit. That issue is no longer before us because the parties have settled it.

In 1990 Congress amended the Clean Air Act to include Title V. Clean Air Act Amendments of 1990, Pub. L. No. 101–549, §§ 501–507, 104 Stat. 2399, 2635–48 (1990). It requires stationary sources of air pollution such as manufacturing and electricity plants to obtain permits which include emission limitations and other conditions that ensure compliance with the Clean Air Act's air quality control standards. See 42 U.S.C. § 7661a(a). The Title V permit program generally does not impose new substantive air quality control requirements. Instead, in order to ensure compliance with existing requirements, Title V requires permits to contain monitoring, record keeping, reporting, and other conditions. The Title V program strives to "enable the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements." Operating Permit Program, 57 Fed. Reg. 32,250, 32,251 (July 21, 1992) (to be codified at 40 C.F.R. pt. 70). The goal is "[i]ncreased source accountability and better enforcement." Id.

When state permitting authorities issue Title V permits, the terms of those permits must comply with their EPA-approved state implementation plans. See 40 C.F.R. Part 70 (codifying EPA rules that set minimum requirements for state operating permit programs and standards for state-issued permits). As for the

4

process, state permitting authorities must provide at least 30 days for public comment on draft Title V permits and must give 30 days notice of any public hearing. 40 C.F.R. § 70.7(h)(4). Notice must be given "by publication in a newspaper of general circulation in the area where the source is located or in a State publication designed to give general public notice; to persons on a mailing list developed by the permitting authority, including those who request in writing to be on the list; and by other means if necessary to assure adequate notice to the affected public." Id. § 70.7(h)(1). Permitting authorities may not issue a Title V permit unless all of the public participation requirements set forth in § 70.7(h) of the regulations are satisfied. Id. § 70.7(a)(1)(ii).

After the state authority considers any comments and approves a permit, it submits that permit to EPA for review. See 42 U.S.C. § 7661d(a)(1); 40 C.F.R. § 70.8(a)(1). EPA has 45 days to object to the proposed permit. 42 U.S.C. § 7661d(b)(1). If it does object, the proposed permit is sent back to the state authority which must correct the problem. Id. If EPA does not object, any person may challenge its failure to do so by petitioning the EPA Administrator within 60 days after the 45-day review period has expired. Id. § 7661d(b)(2); 40 C.F.R. § 70.8(d). The petition must be based only on objections to the permit that were raised during the comment period, unless the petitioner shows that it was

5

impracticable to raise those objections at that time or that the objections arose after the comment period. 42 U.S.C. § 7661d(b)(2). If the petitioner demonstrates that the permit does not comply with the requirements of the Clean Air Act or the applicable state implementation plan, EPA must issue an objection to the permit. Id.

## II.

### A.

Because the Clean Air Act sets forth no independent standard of review, see 42 U.S.C. § 7607(b), and because an EPA decision not to object to a Title V permit is a final agency decision, we apply the deferential standard of review set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701–706. See Legal Envtl. Assistance Found., Inc. v. EPA, 118 F.3d 1467, 1473 (11th Cir. 1997) (applying the Administrative Procedure Act's standard of review to an EPA final decision to deny a petition to promulgate a rule). EPA's decision may be set aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, we give deference to a final agency decision by reviewing for clear error, and we cannot substitute our own judgment for that of the agency. Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002) (citing Motor Vehicle

6

Mfrs. Ass'n of United States, Inc., v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2866–67 (1983)).

Although the standard of review applied to final agency decisions is deferential, the matter is a little more complicated than that. Under the arbitrary and capricious standard, we must consider whether an agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996) (quotation marks omitted). "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." Id. (quotation marks omitted).

## B.

When we review an agency's interpretation of a statute that the agency is responsible for administering, we apply a two-step test. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781–82 (1984); see also Lewis v. Barnhart, 285 F.3d 1329, 1333 (11th Cir. 2002); Legal Envtl. Assistance Found. v. EPA, 118 F.3d at 1473. First, we must determine "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842, 104 S. Ct. at 2781. Then, if Congress' intent is clear from the statutory language, we must give effect to it. Id. at 842–43, 104 S. Ct. at 2781.

"[I]f the statute is silent or ambiguous with respect to the specific issue," we must decide whether the agency based its interpretation on a permissible construction of the statute. Id. at 843, 104 S. Ct. at 2782. To uphold EPA's interpretation of a statute, we "need not conclude that the agency construction was the only one it permissibly could have adopted" or even that we would have interpreted the statute the same way that the agency did. Id. at 843 n.11, 104 S. Ct. at 2782 n.11.

## C.

An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 911 (1997) (citations and quotation marks omitted); see also Legal Envtl. Assistance Found., Inc. v. EPA, 276 F.3d 1253, 1262 (11th Cir. 2001). This deferential standard applies as long as the agency does not promulgate "a parroting regulation" that does nothing more than "paraphrase the statutory language" that it should be implementing. See Gonzales v. Oregon, No. 04-623, 546 U.S. ___, 2006 WL 89200 at *9 (Jan 17, 2006).

We will uphold the agency's interpretation of its regulations "so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." Legal Envtl. Assistance Found., 276 F.3d at 1262 (citation and quotation marks omitted); see also U.S. Steel Mining Co. v.

8

Dir., Office of Workers' Comp. Programs, 386 F.3d 977, 985 (11th Cir. 2004) (explaining that "[t]he obligation to defer to an agency's reasonable interpretation of its own regulations is rooted not only in our case law, but also in binding Supreme Court precedent") (citations omitted). We apply this deferential standard of review "even if [the agency's] interpretation is not 'the best or most natural one by grammatical or other standards.'" Legal Envtl. Assistance Found., 276 F.3d at 1262 (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702, 111 S. Ct. 2524, 2537 (1991)). Deference permits some degree of disagreement.

**III.**

A.

King Finishing sought a Title V permit for its Dover, Georgia facility where the company bleaches, dyes, finishes, and prints cotton and synthetic fabrics. This facility uses two boilers that burn fuel oil and natural gas, and its primary air emissions are particulate matter, sulfur dioxide, and nitrogen oxides.

In April 2001 Georgia Environmental Protection Division published a notice in a local newspaper announcing the 30-day comment period on the draft Title V permit for King Finishing. The comment period ended in May 2001. The next month Georgia EPD established the mailing list required by EPA regulations. See 40 C.F.R. § 70.7(h)(1). Because the mailing list was not created until after the

9

time for public comment on the King Finishing draft permit had expired, Georgia EPD failed to comply with the mailing list requirement set forth in 40 C.F.R. § 70.7(h)(1).

Even though it had actual knowledge of the public comment period, the Sierra Club brought the lack of mailing list notice to the attention of Georgia EPD during the comment period. Because of that failure to follow the regulation, the Sierra Club requested that the King Finishing permit be put through the notification process again. Georgia EPD responded that it had provided notice through the other means specified in the regulation. It had actually made some changes to the King Finishing permit based on other comments that Sierra Club had made.[3] Georgia EPD determined that its implementation of a mailing list after it had issued the King Finishing permit sufficiently addressed the Sierra Club's concerns, the idea apparently being that too late can still be close enough for government work.

The Sierra Club then timely requested that EPA object to the King Finishing permit because of the lack of mailing list notice and on other grounds. EPA

---

[3] Georgia Center for Law in the Public Interest submitted comments on behalf of the Sierra Club for the King Finishing and Monroe Power draft permits and on behalf of Georgia Forestwatch for the Shaw Industries' Plants No. 2 and No. 80 draft permits. For the sake of simplicity, we refer to those comments as having been submitted by the Sierra Club or Georgia Forestwatch.

denied this request, reasoning that, despite the regulation's requirement that a state permitting authority provide notice to the public via a mailing list, the use of a mailing list would not have significantly increased public participation.

EPA's Title V regulations unambiguously require that a state permitting authority must notify the public of the opportunity to comment on draft Title V permits by several means, one of which is a mailing list. See 40 C.F.R. § 70.7(h)(1). It is undisputed that Georgia EPD approved the King Finishing permit without complying with the mailing list requirement. EPA regulations clearly provide that permits may be issued only if "the permitting authority has complied with the requirements for public participation under paragraph (h) of [40 C.F.R. § 70.7]." 40 C.F.R. § 70.7(a)(1)(ii). As we have noted, paragraph (h) is the provision that makes mailing list notice mandatory. The Sierra Club's position that since Georgia EPD did not comply with the requirements of 40 C.F.R. § 70.7(h)(1), EPA must object to the issuance of the permit is a strong one. Before we can bless that position with a holding, however, we must decide whether the Sierra Club has standing to assert it.

B.

In accordance with the "case or controversy" requirement of Article III, a plaintiff must have standing to bring a claim in federal court. See U.S. Const. Art.

11

III, § 2, cl. 1; see also Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324 (1984) ("[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."). EPA contends that the Sierra Club lacks standing to challenge its decision not to object to the King Finishing permit because the Sierra Club did have actual notice of the public opportunity to comment and did in fact comment.

The Sierra Club bases its standing on the procedural injury it claims was suffered by one of its members, Judge Ogden Doremus, who lives and fishes near the King Finishing facility. An association such as the Sierra Club has standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977). The EPA does not contest the last two elements, only the first one. It says that the Sierra Club does not have standing to raise the claim for Judge Doremus because he would not have standing to bring it himself. We turn to that question.

12

By affidavit Judge Doremus attests that not only is he a longtime resident of the community surrounding the plant and sometimes fishes near it, but he also is "concerned that emissions from the King Finishing plant will harm [his] health and the health of [his] friends and family in Southeast Georgia, and that these emissions will also have a negative impact on the aesthetic beauty of the surrounding area." Doremus Aff. at 2, ¶ 6. Connecting that injury to the procedural omission, Judge Doremus says in his affidavit that "because of defective public participation procedures and inadequate reporting requirements, [he] cannot be certain that the King Finishing facility does not emit pollutants in illegal quantities." Id. He explains:

> Had Georgia EPD established a mailing list to notify the public of opportunities to review and comment on proposed Title V permits by the time of the public comment period [for] the King Finishing permit, Sierra Club members, as well as other members of the general public, would have reviewed and commented on that permit. This additional public input could have led to improvements in the King Finishing permit, which, in turn, could have reduced the harm caused by the air pollution emitted by the King Finishing plant.

Id. at 4, ¶ 10. According to the affidavit, the lack of a mailing list reduced the amount of public comment and the likelihood that violations of the permit would be detected, thereby raising the risk of environmental damage and increasing his concerns. Id. at 2–5.

13

The shortcoming of that affidavit, according to EPA, is this. The only people who have standing to challenge an asserted defect in the notice procedures are those who did not get actual notice and would have commented if they had, and Judge Doremus' affidavit does not put him within that category. If the EPA's legal premise is correct, the Sierra Club does lack standing because it has not presented an affidavit from any member who did not comment but would have if proper notice had been given. We will now examine that legal premise.

A plaintiff has standing under the Constitution when: (1) the plaintiff has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision of the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992). When the plaintiff complains of an injury in fact that is procedural in nature, the plaintiff must demonstrate that "the procedures in question are designed to protect some threatened concrete interest of his." Id. at 573 n.8, 112 S. Ct. at 2143 n.8. Our view of Lujan is that the question of whether a plaintiff has a procedural right is inseparable from the requirement of a concrete injury.

14

In <u>Lujan</u> the plaintiffs filed suit under the citizen suit provision of the Endangered Species Act. <u>Id.</u> at 571–72, 112 S. Ct. at 2142. They challenged a rule promulgated by the Secretary of the Interior which provided that the Endangered Species Act's requirement of interagency consultation applied only to actions within the United States or on the high seas. <u>Id.</u> at 557–58, 112 S. Ct. at 2135. The Supreme Court concluded that because the plaintiffs had no immediate intention to return overseas to the sites of the challenged development projects that allegedly threatened endangered species, the rule did not affect them. <u>Id.</u> at 564–66, 112 S. Ct. at 2138–39. As a result, the plaintiffs could show no concrete injury and did not have standing. <u>Id.</u>

The <u>Lujan</u> Court offered two examples of procedural requirements that a plaintiff would have standing to enforce: (1) a required hearing prior to the denial of his license application, and (2) the required issuance of an environmental impact statement before a federal facility was constructed next door to him. <u>Id.</u> at 572, 112 S. Ct at 2142. Elaborating on the second example, the Court explained that:

> [U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement

15

> will cause the license to be withheld or altered, and even
> though the dam will not be completed for many years.

Id. at 572 n.7, 112 S. Ct. at 2142 n.7.

The Court indicated that these procedural requirements are enforceable because disregarding them could impair a plaintiff's non-procedural, concrete interest.  See id. at 572, 112 S. Ct at 2142.  The Court emphasized that it did "not hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."  Id. at 573 n.8, 112 S. Ct. at 2143 n.8.  In other words, determining whether a plaintiff can enforce a procedural right requires determining whether he has suffered a concrete injury as a result of the claimed procedural error or omission.

The Lujan decision reaffirms that claims amounting to generalized grievances against the government are insufficient to confer standing on plaintiffs. Id. at 573–74, 112 S. Ct. at 2143.  As examples of generalized grievance lawsuits, the Lujan Court mentioned the following:  a suit that challenged the propriety of the process by which the Nineteenth Amendment was ratified, Fairchild v. Hughes, 258 U.S. 126, 129–130, 42 S. Ct. 274, 275 (1922), a taxpayer suit that challenged the propriety of federal expenditures, Massachusetts v. Mellon, 262 U.S. 447, 43 S. Ct. 597 (1923), and a suit that claimed Justice Black's appointment

16

to the Supreme Court violated the Ineligibility Clause, <u>Ex parte Lévitt</u>, 302 U.S. 633, 58 S. Ct. 1 (1937). <u>Id.</u> at 574, 112 S. Ct. at 2143–44. The Court's analysis in <u>Lujan</u> suggests that a procedural injury not personal to a plaintiff is enough to confer standing if that injury is connected to a separate concrete interest of the plaintiff's. <u>See</u> <u>Fla. Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 665 (D.C. Cir. 1996) (interpreting <u>Lujan</u> as "finding a procedural right in the citizen suit provision of the Endangered Species Act").

In <u>Region 8 Forest Service Timber Purchasers Council v. Alcock</u>, 993 F.2d 800 (11th Cir. 1993), we held that a trade association had no standing to claim procedural injuries under the National Environmental Policy Act, the Endangered Species Act, or the National Forest Management Act. <u>Id.</u> at 802. The plaintiffs contended that they were injured by the United States Forest Service's failure to comply with certain procedures required by those acts when it adopted a policy governing timber cutting around woodpecker colonies on federal land. <u>Id.</u> at 810.

The plaintiffs in <u>Alcock</u> claimed that the procedures used by the Forest Service injured their rights to "information, participation, and informed decision making." <u>Id.</u> We held that these injuries were "generalized grievances" similar to those in <u>Lujan</u>. <u>Id.</u> This Court in <u>Alcock</u>, like the Supreme Court in <u>Lujan</u>, concluded that the plaintiffs lacked standing because they failed to connect the

17

procedural injury to a "separate concrete interest" distinct from the general public's interest. See id. at 810–11; see also id. at 810 n.16 ("This is not a case where the failure to follow a mandated procedure caused a distinct injury, different from that suffered by the public generally.").

Because this Court in Alcock had already rejected the plaintiffs' asserted economic, quality of life, and environmental injuries, no "separate concrete interest" could serve as the basis for standing to assert the procedural injury. Id. at 811. We stated that in order to support a plaintiff's standing to sue, "the injury alleged must be personal." Id. at 809. We did not conclude, however, that the procedural right itself—the violation of which might give rise to a concrete and personal injury—necessarily had to be personal to the plaintiff for him to have standing. See id. at 809–11. No decision cited to us has required that, and at least one court has rejected the notion. See Sw. Ctr. for Biological Diversity v. Forest Serv., 82 F. Supp. 2d 1070, 1077–78 (D. Ariz. 2000) (holding that even though the Endangered Species Act required the Forest Service to consult with the Wildlife Service and gave the plaintiffs no right to participate in the consultation process, plaintiffs had alleged a cognizable injury in fact for standing purposes).[4]

_____

[4] Utah v. Babbitt, 137 F.3d 1193 (10th Cir. 1998), is not to the contrary. The Babbitt plaintiffs claimed injury because they were denied their right to participate in the inventory of federal lands under the Federal Land Policy and Management Act. Id. at 1206. The Tenth Circuit held that the plaintiffs had no standing because the FLPMA did not require public

18

We conclude that a plaintiff has established procedural injury standing if he has established that the claimed violation of the procedural right caused a concrete injury in fact to an interest of the plaintiff that the statute was designed to protect. See Fla. Audubon Soc'y , 94 F.3d at 665 (requiring a plaintiff who claims procedural injury to demonstrate "that the defendant's acts omitted some procedural requirement, [and] . . . it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest"); see generally Pac. Nw. Generating Coop. v. Brown, 38 F.3d 1058, 1065 (9th Cir. 1994) (noting that by requiring a certain procedure in a statute, Congress has causally linked that procedure with the goal of the statute).

In applying this test to the present case, we begin with the injury in fact requirement, keeping in mind that "environmental plaintiffs adequately allege injury in fact when they aver they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183, 120 S. Ct. 693, 705 (2000) (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S. Ct. 1361, 1366 (1972)). Judge Doremus' affidavit brings him within

participation during the inventory process, and, therefore, no procedural right had been violated. Id. at 1210. The court did not require the plaintiffs to show, in order to establish standing, that their personal participation rights had been violated. See id. at 1206–10. The court merely recognized that no statutory procedures had been violated in that case. Id. at 1210.

19

that description, assuming that reduced aesthetic and recreational values stemming from concern about pollution qualifies. It does. The Second Circuit has observed that "the distinction between an alleged exposure to excess air pollution and uncertainty about exposure is one largely without a difference since both cause personal and economic harm." N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 326 (2d Cir. 2003). The court explained in Whitman that "[t]o the extent that this distinction is meaningful, it affects the extent, not the existence, of the injury." Id. Judge Doremus' injury in fact exists as a result of concerns about pollution, concerns that arise because the failure to use one of the mandated public participation procedures leaves him uncertain about whether pollution is being emitted in illegal quantities. See Doremus Aff. at 2, ¶ 6.

It is true, as EPA emphasizes, that Judge Doremus has never contended that he did not have actual notice of the opportunity to comment on the King Finishing draft permit. That does not, however, remove his concern about the potential impact of the failure to utilize a mailing list on the correctness of the result in the permitting process. Actual notice is irrelevant to the injury claimed in Judge Doremus' affidavit, which states that use of the required mailing list would have led to additional public input, which "could have led to improvements in the King Finishing permit, which, in turn, could have reduced the harm caused by the air

pollution emitted by the King Finishing plant." Doremus Aff. at 4, ¶ 10. See

Idaho Farm Bureau v. Babbitt, 900 F. Supp. 1349, 1363–64 (D. Idaho 1995)

(disregarding actual notice to conclude that the Fish & Wildlife Service violated

plaintiffs' procedural rights under the Federal Advisory Committee Act when the

FWS failed to chair a required meeting, publish notice of that meeting, and prepare

and maintain minutes of the meeting even though the plaintiffs attended and

actively participated in that meeting).

For these reasons, Judge Doremus would have standing in his own right to

challenge the failure to maintain and use a mailing list, and the Sierra Club has

associational standing to raise the claim on his behalf as one of its members.

C.

Turning to the merits, EPA concedes that the plain language of 40 C.F.R. §

70.7(h)(1) establishes the mailing list requirement and admits that Georgia EPD

did not satisfy this requirement before issuing the King Finishing permit.

Nonetheless, EPA contends that it was not required to object to the King Finishing

permit on that ground. EPA makes a distinction between procedural defects, to

which it need not object, and defects in a permit to which it must. It contends that

the lack of mailing list notice did not create a defect in the permit because the

Sierra Club has not demonstrated that this omission actually resulted in less

21

meaningful public participation. After all, EPA argues, Georgia EPD used other means to notify the public, and the Sierra Club itself commented on the draft permit. Not much harm, not much foul, it seems to say.

The Clean Air Act and EPA's own regulations do not allow EPA unfettered discretion to ignore obvious violations of Title V permit program requirements. Chevron deference requires us to give effect to Congress' intent when that intent is clear from the statutory language. Chevron, 467 U.S. at 842–43, 104 S. Ct. at 2781. It is clear that Congress intended for EPA to object to a permit when the public participation requirements for issuing it have not been met. See 42 U.S.C. § 7661d(b)(2) (providing that the EPA Administrator "shall issue an objection" if a permit is defective) (emphasis added); 40 C.F.R. § 70.7(a)(1)(ii) (stating that a permit may issue "only if" the requirements for public participation under 40 C.F.R. § 70.7(h) are met); see also U.S. Steel Corp. v. EPA, 595 F.2d 207, 212–15 (5th Cir. 1979) (failure to follow public participation requirements of the Administrative Procedure Act renders agency action invalid); N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d at 333–34. If that were not otherwise clear, the conference report for the 1990 amendments settles it: "[Section 7661d(b)(2)] sets out clearly the procedures required of EPA in reviewing permits. Simply put, [EPA] is required to object to permits that violate the Clean Air Act. This duty to

22

object to such permits is a nondiscretionary duty." 136 Cong. Rec. S16,895, 16,944 (1990); see also N.Y. Pub. Interest Research Group, 321 F.3d at 333 n.12 (quoting same).

Even under the deferential standard of review that we apply to an agency's interpretation of its own regulations, EPA is wrong in asserting that it can avoid its own unambiguous mailing list requirement in the Title V permitting process. The statute itself says that EPA has a duty to object when the statutory requirements are violated by a state permitting authority. 42 U.S.C. § 7661d(b)(2) ("The Administrator shall issue an objection within such period if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of [the Clean Air Act], including the requirements of the applicable implementation plan."). The regulations implement the statutory requirements. It follows that the duty to object extends to the implementing regulations. Otherwise, the statutory interests could be undermined by EPA's overly generous attitude toward the mistakes of the state permitting authority. When it comes to the Title V permitting process, EPA is not a board of pardons. Its duty is to enforce requirements, not to grant absolution to state agencies that have violated them.

While we accord EPA's interpretation of its regulations much deference, we will not abdicate our obligation to review those interpretations. For the reasons we have discussed, we conclude that EPA abused its discretion and acted arbitrarily and capriciously when it failed to object to the King Finishing permit based on Georgia EPD's failure to comply with the mailing list requirement set out in 40 C.F.R. § 70.7(h)(1). On that basis, insofar as the King Finishing facility permit is concerned, we grant the petition for review, vacate the EPA order, and remand this case to the EPA for further consideration.

## IV.

In addition to the King Finishing facility permit, Georgia EPD issued permits to Monroe Power and to Shaw Industries' Plant No. 2 and Plant No. 80. The Sierra Club and Georgia Forestwatch challenge EPA's decision not to object to all four permits on the ground that they require the permittees to report only monitoring results showing permit deviations rather than monitoring that shows both permit deviations and compliance. This dispute is about the extent of the reporting that the statute and regulation require.

### A.

Section 7661c(a) of the Clean Air Act provides:

> Each permit issued under [Title V] shall include . . . a requirement that the permittee submit to the permitting

24

authority, no less often than every 6 months, <u>the results of any required monitoring</u>, and such other conditions as are necessary to assure compliance with applicable requirements of [the Clean Air Act], including the requirements of the applicable implementation plan.

42 U.S.C. § 7661c(a) (emphasis added).  The statute does not define "results," which leads to the question: what does "submit . . . the results of any required monitoring" mean?

EPA's corresponding regulation, 40 C.F.R. § 70.6, elaborates on the reporting duty as follows:

> (a) Standard permit requirements.  Each permit issued under this part shall include the following elements:
>
> *       *       *
>
> (3) Monitoring and related record keeping and reporting requirements
>
> *       *       *
>
> (iii) With respect to reporting, the permit shall incorporate all applicable reporting requirements and require the following:
>
> (A) <u>Submittal of reports of any required monitoring</u> at least every 6 months.  <u>All instances of deviations</u> from permit requirements must be clearly identified in such reports.  All required reports must be certified by a responsible official . . . .

40 C.F.R. § 70.6(a)(3)(iii)(A) (emphasis added).

The permits, which reflect EPA's (and Georgia EPD's) interpretation of the statute and regulation, only require the reporting of monitoring results that show deviations from the permit requirements; they do not require permittees to report results showing emissions within permissible limits. EPA contends that 42 U.S.C. § 7661c(a) and 40 C.F.R. § 70.6(a)(3)(iii)(A) merely require permittees to submit reports that (1) identify all instances of deviations and (2) are certified by a responsible official. EPA argues that its approach is reasonable because the challenged permits do require the sources to state affirmatively that no deviations occurred if, in fact, there were no deviations during a particular reporting period. According to EPA, it is reasonable to conclude that the purpose of 42 U.S.C. § 7661c(a) and 40 C.F.R. § 70.6(a)(3)(iii)(A), is to require enough reporting to assure compliance and reporting of deviations is enough for that.

Sierra Club and Georgia Forestwatch contend that the plain language of 42 U.S.C. § 7661c(a) and 40 C.F.R. § 70.6(a)(3)(iii)(A) mandates that King Finishing, Monroe Power, and Shaw Industries report "any required monitoring," which means reporting all monitoring data and not just deviations. They contend that EPA's narrower interpretation denies full and effective citizen participation by depriving the public of valuable information, because reporting of all monitoring results may show a deviation that the permittee failed to recognize or

26

report. They insist that, without all monitoring data, the public will be unable to detect unreported deviations.

EPA argues that reporting of "any required monitoring" can be achieved in a variety of ways, and that neither 42 U.S.C. § 7661c(a) nor 40 C.F.R. § 70.6(a)(3)(iii)(A) specifies what form the monitoring report must take. According to EPA, the challenged permits, which require quarterly reporting of deviations, malfunctions, operating time, monitor down time, and other information, provide sufficient information to indicate whether operations are in compliance with permit terms and conditions. More specifically, EPA says that the following requirements in the challenged permits constitute sufficient "reports" of "any required monitoring": all of the facilities must (1) keep monitoring systems in continuous operation with data recorded during all periods of operation; (2) state affirmatively that there were no deviations if, in fact, no deviations occurred for a given reporting period; and (3) have a responsible official certify that the contents of the reports are true, accurate, and complete.

B.

The challenged action in this case is EPA's decision not to object to each of four permits issued by Georgia EPD. EPA did not object to those permits because it determined that each of them complied with the reporting requirement of 40

27

C.F.R. § 70.6(a)(3)(iii)(A). That determination was based on EPA's interpretation of its own regulation.

We have explained that our "obligation to defer to an agency's reasonable interpretation of its own regulations is rooted not only in our case law, but also in binding Supreme Court precedent." U.S. Steel Mining, 386 F.3d at 985 (citations omitted). According to that precedent, "when an agency has regularly advocated a uniform interpretation of its regulation, the interpretation is deserving of substantial deference unless it is plainly erroneous or inconsistent with the regulation." Id. (citing Mullins Coal Co. of Va. v. Dir., Office of Workers' Comp. Programs, 484 U.S. 135, 159, 108 S. Ct. 427, 440 (1987)) (quotation marks omitted).

The Sierra Club and Georgia Forestwatch argue that EPA has not uniformly interpreted 40 C.F.R. § 70.6(a)(3)(iii)(A) because it once defined "any required monitoring" as all required monitoring (not just deviations), and it should be bound by that prior interpretation. As evidence of this prior inconsistent interpretation, they rely on a memo written by a member of EPA's staff and sent to Georgia EPD. According to that memo, in order to comply with 40 C.F.R. § 70.6(a)(3)(iii)(A), another draft permit with the same monitoring and reporting requirements as those in the four permits involved in the present case should have

28

been revised to require reporting of all monitoring and not just reports of deviations. However, EPA implicitly rejected the position advocated in the memo by issuing that permit without the suggested revision.

The point is that the memo does not evidence a regularly advocated, uniform interpretation of 40 C.F.R. § 70.6(a)(3)(iii)(A) because the memo merely contains staff comments on a draft permit. It is not a formal determination of the agency. Given that EPA ultimately accepted and issued the earlier permit with the same monitoring and reporting requirements as the four permits challenged in this case, we infer consistency in the position that reporting of deviations is all that is required by 40 C.F.R. § 70.6(a)(3)(iii)(A) and the statute it implements.

When an agency has interpreted one of its regulations in a consistent manner, that interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." Auer, 519 U.S. at 461, 117 S. Ct. at 911 (quotation marks and citation omitted).[5] Under EPA's interpretation of 40 C.F.R. §

---

[5] Our application of Auer deference in this case is not undermined by the Supreme Court's recent decision in Gonzales v. Oregon, No. 04-625, 546 U.S. __, 2006 WL 89200 (Jan. 17, 2006). In that case, the Supreme Court held that it would not accord Auer deference to an Attorney General rule interpreting a "parroting regulation" that "just repeats two statutory phrases and attempts to summarize the others." Gonzales v. Oregon, 2006 WL 89200 at *9. The Supreme Court reasoned that "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." Id.

The regulation at issue in this case does not merely "parrot" the statute. Although 42 U.S.C. § 7661c(a) and 40 C.F.R. § 70.6(a)(3)(iii)(A) both use the phrase "any required

70.6(a)(3)(iii)(A), a permittee is required to file certified reports containing monitoring data showing deviations (or a statement that no deviations occurred), malfunctions, operating time, monitor down time, and other information; it is not required to submit all of its monitoring data. In light of the fact that the text of the regulation does not specify what data must be included in the reports, we cannot say that this interpretation is plainly erroneous or inconsistent with the regulation. EPA's interpretation reflects the regulation's emphasis on deviations and also requires the reporting of other pertinent monitoring data. Moreover, requiring permittees to submit reports containing only deviations, as opposed to submitting a voluminous amount of raw data from all monitoring, is reasonable since deviations are particularly relevant to determining whether a source is complying with the Clean Air Act. See 42 U.S.C. § 7661c(a) ("Each permit . . . shall include . . . a requirement that the permittee submit . . . the results of any required monitoring, and such other conditions as are necessary to assure compliance with the applicable requirements of [the Clean Air Act] . . . .").

Under the deferential standard of review we apply, our inquiry ends where, as here, we conclude that EPA's interpretation of the regulation is not plainly

monitoring," the regulation does more. The regulation specifies that the permittee must "clearly identif[y]" "all instances of deviations" in monitoring "reports" and requires that those reports be certified.

erroneous or inconsistent with the regulation's plain language, see U.S. Steel Mining, 386 F.3d at 985, and its interpretation of the statute is reasonable, see Chevron, 467 U.S. at 844–45, 104 S. Ct. at 2782–83. It follows that EPA's decision not to object to the four title V permits at issue on the basis that they did not require reporting of all monitoring data was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A). Accordingly, we deny the petition insofar as it concerns EPA's refusal to object to the permits based on claims of inadequate reporting of monitoring results.

## V.

Finally, the Sierra Club and Georgia Forestwatch contend that EPA should have objected to all four permits because Georgia EPD failed to provide the public with adequate information about the facilities during the public comment period. EPA's regulation governing public participation in the issuance of draft Title V permits requires state permitting authorities to give notice of:

> the name, address, and telephone number of a person from whom interested persons may obtain additional information, including copies of the permit draft, the application, all relevant supporting materials, . . . and all other materials available to the permitting authority that are relevant to the permit decision . . . .

31

40 C.F.R. § 70.7(h)(2) (emphasis added). This issue involves a dispute over what constitutes information "relevant to the permit decision" for purposes of this regulation. Id.

EPA has approved, and thereby adopted as its own, Georgia EPD's position that the regulation allows a permitting authority to make available to the public only the information that it has actually used in the permit review process. The problem, according to the Sierra Club and Georgia Forestwatch, is that additional relevant information is kept at the Title V facilities; the public has no access to this information; and Georgia EPD may, and often does, choose not to review it. For example, monitoring data is often kept at the facilities, and facilities' risk management plans, if they exist, are housed at the Risk Management Plan Reporting Center in Virginia. Georgia EPD may choose not to use these materials in developing the draft permits.

The Sierra Club and Georgia Forestwatch argue that the plain language of 40 C.F.R. § 70.7(h)(2) requires public access to all information that is relevant and available to the permitting authority—not just the information that the permitting authority deems relevant and actually uses in its permitting review process. Georgia EPD's public notice makes available for review the draft permit and all of

32

the materials that it actually used to develop the permit—not all of the materials that it could have used.

Again we are considering EPA's interpretation of its own regulations, and again we apply a deferential standard of review.  See Legal Envtl. Assistance Found., 276 F.3d at 1262 (giving the agency's interpretation "controlling weight," "even if this interpretation is not the best or most natural one by grammatical or other standards") (citations and quotation marks omitted).  EPA has determined that the phrase "materials available to the permitting authority that are relevant to the permit decision," 40 C.F.R. § 70.7(h)(2), means the information that the permitting authority has deemed to be relevant by using it in the permitting process.  EPA argues that Sierra Club's contrary interpretation of the regulation would place no boundaries on the scope of the "relevant" material that a permitting authority would have to produce, and that a citizens' group would inevitably claim a violation of § 70.7(h)(2) if the permitting authority excluded any requested information.

EPA's interpretation of § 70.7(h)(2) may not be the one that we would have chosen, but it is not contrary to the plain meaning of the language.  Nor can we say that EPA's interpretation is unreasonable.  The regulation does not detail what materials are "relevant to the permitting decision" and does not specify who gets

33

to decide. Therefore, we conclude that EPA did not abuse its discretion or act arbitrarily or capriciously in refusing to object to the four permits based on the failure of Georgia EPD to provide the public during the comment period with information about the facilities that it, as the permitting authority, did not consider.

**VI.**

Insofar as it concerns the King Finishing facility, we GRANT the petition for review, VACATE the EPA's order, and REMAND the case to EPA for further consideration consistent with this opinion, based on Georgia EPD's failure to use a mailing list for public notification during the comment period. In all other respects, we DENY the petitions for review.